FILED

2016 Mar-18  AM 10:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| STEVEN D. NAPPIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 2:13-cv-01382-JHE |
| | ) | |
| UNITED HEALTHCARE SERVICES, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Steven D. Nappier ("Nappier") initiated this action against his former employer, Defendant United Healthcare Services, Inc. ("UnitedHealth") alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and a state law breach of contract claim.[1]   (Docs. 1, 27, & 28).   UnitedHealth moves for summary judgment as to both of Nappier's claims.   (Doc. 29).   The motion is fully briefed and ripe for review.   (Docs. 30, 38, 41).   For the reasons stated more fully below, the motion for summary judgment, (doc. 29), is **GRANTED**.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, the discovery, and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery

---

[1] Nappier initially asserted a state law claim based on UnitedHealth's alleged failure to pay the full value of commissions owed pursuant to Alabama Code § 8-41-1 et seq. (Doc. 1). After consultation with Defendant's counsel, Plaintiff moved to dismiss this claim, and the undersigned granted the motion.  (Doc. 27 & 28).

and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial."  *Id.* at 324.  (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a Court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts

### A. UnitedHealth and Its EEO Policy and Procedure

UnitedHealth is an operating division of UnitedHealth Group, a leading health carrier in the United States.  (Doc. 31-3 at ¶3).  UnitedHealth Medicare & Retirement, a division of UnitedHealth Group, offers products and services to individuals over the age of fifty.  (*Id.*).  At the time Nappier worked for UnitedHealth, UnitedHealth Medicare & Retirement division was known as "Ovations."  (*Id.* at ¶¶3, 12).

UnitedHealth maintains a strong policy of equal employment opportunity, which prohibits any form of discrimination based on age, race, gender, color, religion, national origin, ancestry, disability, marital status, covered veteran status, sexual orientation, gender identity and/or expression, status with respect to public assistance or any other characteristic protected by statute, federal, or local law.  (Doc. 31-3 at ¶4; doc. 31-1 at 26 (99:5-7)).  UnitedHealth also maintains a separate anti-retaliation policy that prohibits retaliation against any employee who, in good faith, reports unethical behavior or violations of law, regulations, or company policy. (Doc. 31-1 at ¶4).  These policies are available online and in hard copy upon request.  (*Id.* at ¶5).

### B. Nappier's First Period of Employment with UnitedHealth

UnitedHealth initially hired Nappier on or about January 9, 2006, as a Medicare Individual Sales Representative ("ISR") in Montgomery, Alabama.  (Doc. 31-1 at 8, 9 (29:14-18, 30:10-25), doc. 31-2 at 5-10).  Nappier received a written offer of employment setting forth the terms and conditions of his employment with UnitedHealth.  (Doc. 31-1 at 8, 9 (29:23-25, 30:10-25), doc. 31-2 at 5-10).  Nappier is white.  (Doc. 31-1 at 15 (55:6-9)).  Nappier reported to Sales Director Clark Cameron ("Cameron") who in turn reported to Booker Joseph ("Joseph").  (Doc. 31-3 at ¶6).  Joseph is black.  (Doc. 31-1 at 15 (55:4-5)).  Nappier understood that he was an "at

will" employee and was free to resign from his employment at any time, and that UnitedHealth

had no contractual obligation to employ him.  (Doc. 31-1 at 9, 10 (33:13-25, 34:1-16)).

### C.  Nappier Resigns and Goes to HealthSpring

In approximately January 2007, following changes in UnitedHealth's commission

structure, Nappier voluntarily resigned from his employment and accepted a position as an

Independent Medicare Sales Representative with HealthSpring.  (Doc. 31-1 at 9, 12 (32:3-25,

33:1-10, 43:5-8)).  Nappier remained with HealthSpring for approximately eight months.  (*Id.* at

12 (44:4-11)).  .

### D.  Nappier Returns to UnitedHealth

While Nappier was working for HealthSpring, Joseph called him.  (Doc. 31-1 at 41

(160:13-16).  During this call Joseph told Nappier, "man, I need you," and was "after [Nappier]

pretty hard" to return to UnitedHealth.  (Doc. 31-1 at 13, 14, 15 (49:3-14, 53:2-25, 54:2)).

Following his conversation with Joseph and believing the commission issues at UnitedHealth

(with which he had previously had a concern) had been resolved, Nappier reapplied for

employment with UnitedHealth in July 2007.  (Doc. 31-1 at 13 (49:11-18)).  Nappier believed

the application was a matter of form and that it was "pretty much a done deal" that Joseph had

decided to hire him.  (*Id.* at 14 (51:18-24)).  Nappier believes Joseph made the decision to rehire

him with UnitedHealth.  (*Id.* at 15 (56:3-16, 57:3-13)).

Nappier received an offer letter from UnitedHealth, specifically from Joseph, in or

around July 2007.  (Doc. 31-1 at 16 (58:2-19), doc. 31-2 at 11-25, doc. 31-3 at ¶10).  The July

27, 2007 offer letter Nappier received was virtually identical to the December 29, 2005 offer

letter he received when he was first offered employment with UnitedHealth and stated that

Nappier's "employment relationship is 'at will,' which means that [Nappier] or United Health

4

Group may terminate [Nappier's] employment at any time for any reason." (Doc. 31-2 at 5-25). The July 27, 2007 offer letter did not guarantee Napier's employment for any particular length of time, including a lifetime, and did not state his employment was permanent. (Doc. 31-1 at 16-17 (61:8-25, 62:2-9), doc. 31-2 at 11-25). In addition, the offer letter stated that by accepting employment with UnitedHealth, Nappier was agreeing to all terms set forth in the offer letter. (Doc. 31-1 at 17 (63:19-23), doc. 31-2 at 11-25). When initially rehired in 2007, Nappier again reported directly to Sales Director Clark Cameron, who in turn reported to Joseph. (Doc. 31-1 at 18 (66:16-20)). Sometime in 2009, Todd Skaggs ("Skaggs") replaced Cameron as Sales Director, and Nappier and all the other ISRs in Alabama began reporting directly to Skaggs. (*Id.* (67:3-18)).

On or about August 17, 2007, Nappier began working for UnitedHealth as an ISR. (Doc. 31-1 at 10 (34:17-25, 35:2-7), doc. 31-3 at ¶12). As an ISR, Nappier's job responsibilities included being training and educated on UnitedHealth's products, and then prospecting, educating, and selling insurance products, particularly Medicare Advantage, to clients. (Doc. 31-1 at 18 (67:23-25, 68:2-8)). Nappier was one of six ISRs in the state of Alabama. (Doc. 31-1 at 20 (75:7-25, 76:2-6); doc. 31-3 at ¶13). UnitedHealth contends it employed John Walley (white), Jeffrey Treganowan (white), and Benjamin Alexander (white) in the Mobile area; Leonard Smoot (black) and Joe Teel (white) in the Birmingham area, and Nappier in the Montgomery area. (Doc. 31-1 at 20 (75:7-25, 76:2-6), doc. 31-3 at 13). Nappier explains that the geographic scope of ISRs was not "divide[d] up;" instead, Nappier, like all ISRs, "worked where [he] could work" throughout Alabama, provided that the county was eligible for coverage. (Doc. 31-1 at 19 (72:16-23)). All ISRs with UnitedHealth "were salespeople . . . competing for business" without geographic restriction, and "weren't just tied to a certain area" but worked

"anywhere [they] could . . . wherever." (*Id.* at 20 (74:16-17, 75:5-6, 75:15-18)).

ISRs received client referrals through two primary means.  First, UnitedHealth could provide referrals based upon marketing responses received from prospective clients.  (Doc. 31-1 at 21 (78:9-12); doc. 31-3 at ¶15).  Second, ISRs could use a referral broker to provide them with leads.  (Doc. 31-1 at 20 (77:19-25); doc. 31-3 at ¶15).  When utilizing a referral broker program, the ISR would purchase a list of Medicare eligible leads and utilize a referral broker to contact those leads and set up sales appointments for the ISR.  (Doc. 31-1 at 20 (77:19-25); doc. 31-3 at ¶15).  If an ISR made a sale, UnitedHealth would pay the referral broker a commission.  (Doc. 31-1 at 20, 21 (77:24-25, 78:2-3); doc. 31-3 at ¶15).  Nappier primarily relied upon the broker referral program to obtain his sales leads, and received few company leads, though he admittedly did not ask to receive them.  (Doc. 31-1 at 21 (78:13-18, 79:21-24, 80:6-13)).

Upon his rehire, Nappier was paid $27,000.00 per year salary, plus he received commission for the insurance policies he sold.  (Doc. 31-1 at 16, 23-24 (60:2-8, 89:23-25, 90:2-8); doc. 31-2 at 11-25).  Commissions were paid on a tiered structure, meaning the more applications Nappier wrote, the higher percentage of commission he received per application.  (Doc. 31-1 at 24 (90:14-25, 91:1-10); doc. 31-3 at ¶16).  Commission payments were made to ISRs in the month the enrollment became effective followed by a three-month commission recoupment period to allow for rapid disenrollment, meaning if the customer did not stay with UnitedHealth for at least three months following the initial application for insurance, any commission paid to the agent for that application was charged back to the agent.  (Doc. 31-1 at 37 (145:12-24); doc. 31-3 at ¶16).  Furthermore, if an agent left the company, the final commission payment to the agent was held for three months to allow for any rapid disenrollment of policies written during the last three months of the agent's employment. (Doc. 31-1 at 37

(145:12-24); doc. 31-3 at ¶16).

During his second employment with UnitedHealth, Nappier received two performance evaluations. (Doc. 31-1 at 26 (99:14-25, 100:2-15); doc. 31-2 at 29-36). Nappier's 2008 performance evaluation rated his performance an overall "meets expectations." (Doc. 26-27 (101:24-25, 102:2-5); doc. 31-2 at 29-32). Nappier's 2009 performance evaluation rated his overall performance as "exceeds expectations." (Doc. 31-1 at 27 (102:15-25); doc. 31-2 at 33-36). In connection with the 2009 performance evaluation, Cameron, Nappier's supervisor, wrote "[Nappier] is the most experienced and historically the most productive ISR on my team. He has a great deal of Medicare knowledge and natural sales ability. His work ethic is second to none, and the prospects and members relate very well to him. [Nappier] prospered in 2008 by leveraging the referral broker program that was in place at the time. MIPPA has ended that program, but [Nappier] has responded well to the change. I'm grateful for what [Nappier] brings to our Alabama sales team. He is a key member." (Doc. 31-2 at 33-36).

Nappier worked from a home office, as UnitedHealth had closed its Montgomery area office in 2006 as part of its then-plan to withdraw from the Montgomery market. (Doc. 31-1 at 19 (71:11-13); doc. 31-3 at ¶8). UnitedHealth later decided to remain in the Montgomery market, though UnitedHealth never reopened a Montgomery office. (Doc. 31-3 at ¶8). As a telecommuter, UnitedHealth reimbursed Nappier for his mileage, including mileage for sales calls and mileage to attend meetings at UnitedHealth's offices in Birmingham, Alabama. (Doc. 31-1 at 23 (86:9-18); doc. 31-3 at ¶17). Additional, UnitedHealth either provided or reimbursed Nappier for other office expenses, including his cell phone and a computer and printer. (Doc. 31-1 at 23 (86:14-25, 87:2-25, 88:2-16), doc. 31-3 at ¶17).

### E.  UnitedHealth's Reduction-in-Force

In 2009, due to a combination of changes, including regulatory oversight and a significant decrease in the Medicare rate of reimbursement, UnitedHealth instituted a nation-wide reduction-in-force, which affected the ISR positions in the Medicare division.  (Doc. 31-3 at ¶18; doc. 31-1 at 24-25 (93:12-25, 94:2-9)).  During this same time period, UnitedHealth was considering various cost-savings measures including a shift from employee agents, such as ISRs, to the use of independent sales agents.  (Doc. 31-3 at ¶19).  The cost of doing business with independent sales agents is less than the cost of utilizing employee agents, for whom UnitedHealth must provide benefits and a salary instead of paying only commissions.  (*Id.*).

According to UnitedHealth, it made the decision to eliminate all ISR positions in Alabama except for the position John Walley held.  (Doc. 31-3 at ¶¶20-21).  However, because Leonard Smoot was involved in multiple marketing initiatives in Birmingham that UnitedHealth wanted to see through conclusion, UnitedHealth contends it decided to delay the termination of his employment for approximately two months.  (*Id.* at ¶21).  Therefore, UnitedHealth states it eliminated four of the six ISR positions in Alabama, as well as approximately seven other ISR positions outside of Alabama.  (*Id.* at ¶20; doc. 31-1 at 24-25, 31 (93:12-25, 94:2-6, 121:7-12), doc. 31-2 at 43-44).  Specifically, UnitedHealth eliminated two ISR positions it characterizes as "in Mobile" held by Treganowan and Alexander; one position it characterizes as a "Birmingham ISR position" held by Joe Teel, and the ISR position it characterizes as the "Montgomery ISR" position Nappier held.  (Doc. 31-3 at ¶20).

UnitedHealth states it considered a multitude of factors in selecting which ISR positions would be eliminated, including but not limited to profitability of the various markets, an ISR's acquisition cost per lead (meaning the amount of money UnitedHealth had to spend on an ISR, including salary and expenses in order to generate one lead), and the employee's overall

performance and expenses.  (Doc. 31-3 at ¶21).   Based on these considerations, UnitedHealth contends it decided to eliminate all ISR positions in Alabama except for the position Walley held.  (*Id.* at ¶¶20-21).

Following Nappier's termination UnitedHealth maintained two ISR positions in Alabama for an additional two months.  (Doc. 31-3 at ¶¶20-21).  Thereafter, in September 2009, following the conclusion of the marketing initiatives Smoot was leading in Birmingham, UnitedHealth states it also eliminated the remaining ISR position in Birmingham (that Smoot held), leaving only one ISR position in Alabama – the position "in Mobile" held by John Walley.  (*Id.*).

### F.  Termination of Nappier's Employment

Skaggs met with Nappier on or about June 30, 2009, and notified him that his ISR position was being eliminated and that his employment would be terminated effective July 7, 2009.  (Doc. 31-1 at 30 (116:3-25, 117:2-25).  Thereafter, Nappier began providing services to UnitedHealth as an independent agent, and to this day, continues to sell UnitedHealth Medicare products in an independent agent capacity.  (*Id.* at 22 (84:6-13, 85:3-10)).  Nappier's position was not filled.  (Doc. 31-3 at ¶21).  After his termination, Cameron provided Nappier with a letter of recommendation stating, in part, "if I were starting a company or leading a sales division, Steve Nappier would be my first hire."  (Doc. 39-2 at 2).

### G.  Nappier's EEOC Charge and Judicial Complaint

On December 28, 2009, Nappier filed a charge of discrimination with the EEOC, alleging race-based discrimination.  (Doc. 1-1).  On April 24, 2013, the EEOC dismissed Nappier's EEOC charge and issued a right-to-sue letter.  (Doc. 1-2).  On July 24, 2013, Nappier filed his complaint, alleging UnitedHealth discriminated against him because of his race by selecting his position for termination (Count III), breached an alleged oral contract for employment, salary,

and bonus payments (Count I), and violated the Alabama Sales Representative's Commission statute (Count II).  (Doc. 1).  On May 6, 2015, Nappier moved to dismiss Count II, which the undersigned granted.  (Docs. 27 & 28).

### H.  Additional Facts – Race Discrimination Claim

Nappier alleges UnitedHealth discriminated against him based on Joseph's decision to select Nappier's position for elimination and not the position Smoot held.  (Doc. 31-1 at 28, 33 (108:19-25, 109:2-25, 110:13-22, 129:6-9)).  In support of his discrimination claim, Nappier asserts that race had to be the reason he was selected for discharge because he was a successful ISR, he had been with UnitedHealth the longest, he was the top-producing ISR in Birmingham (and he believes in Alabama), and he believes he wrote more applications than Smoot.  (*Id.* at 27-28, 33 (104:19-25, 105:2-25, 106:2-25, 129:2-9)).  Nappier contends his performance numbers and evaluations were better than Smoots', testifying that he "ha[d]n't seen the exact numbers and all . . . . [but he] kn[e]w there was [sic] a lot of months there that [Smoot] would have fix, six sales and I would have 30."  (Doc. 31-1 at 32 (122:7:14)).  Nappier further testified he "recall[ed] seeing something at least one time, maybe more than once. . . .  [UnitedHealth] might have been sending out monthly sales reports of how we stacked monthly," but he couldn't remember exactly.  (*Id.* at 32 (123:7-13)).  At Cameron's request, Nappier helped train Smoot by riding with him on a couple of appointments and showing him how to present the program.  (Doc. 31-1 at 27-28 (105:16-106:2)).

Nappier further contends Joseph treated black employees more favorably.  (Doc. 31-1 at 29 (112:22-25, 113:2-24)).  Specifically, Nappier alleges Joseph was more sociable and friendlier to "black guys" and "liked them more."  (*Id.* at 29-30 (113:8-19, 114:7-24)).  Nappier also states he was "very rarely" around Joseph.  (*Id.* at 29, 30, 37 (113:20-25, 114:2-25, 115:2-

18, 142:17-24)).   Nappier claims that during his first employment with UnitedHealth, Joseph

forced him to give up his desk to a black ISR.[2]  (Doc. 31-1 at 28 (107:21-25, 108:2-7)).

Nappier did not complain about race discrimination while employed at UnitedHealth, but

was never told how to complain pursuant to an EEO policy.  (Doc. 31-1 at 33, 42 (128:4-7,

162:21-24)).   UnitedHealth's Employee Handbook containing its EEO policy was available

online, and Nappier does not dispute he was responsible for reading the policy.  (*Id.*at 25 (96:6 –

98:23).  However, Nappier admits no one ever said anything to him to lead him to believe the

decision to terminate his employment was based upon his race.  (*Id.* at 33-34 (129:13-25, 130:2-

5)).

Joseph made the decision to hire white employees, and Nappier believes Joseph made the

decision to hire him on two different occasions.  (Doc. 31-1 at 15, 34 (56:3-16, 57:3-11, 132:11-

20); doc. 31-3 at ¶29).   Nappier believes UnitedHealth's decision to terminate Smoot's

employment following Nappier's termination was because it "felt like [Nappier] was going to

file a lawsuit" and it was "damage control."  (Doc. 31-1 at at 35 (135:5-23)).  Nappier admits this

belief is based on speculation.  (*Id.*).

Other than the allegations Joseph discriminated against him and treated blacks more

favorably, Nappier does not allege he was discriminated against or treated unfairly by anyone at

UnitedHealth.  (Doc. 31-1 at 33 (127:2-25, 128:2-7)).

## I.   Additional Facts – Breach of Contract Claim

Nappier also claims UnitedHealth breached its contract with him by not paying him

commission for approximately seventeen applications he wrote during the month prior to his

termination. (Doc. 31-1 at 38-39 (146:23-25, 147:2-17, 148:7-25, 149:2-25, 150:2-25, 152:13-

---

[2] UnitedHealth disputes this fact.  (Doc. 31-3 at ¶26).

22); doc., 31-2 at 45).  Skaggs informed Nappier, via email, on October 21, 2009, that Nappier's commission "will be released on the normal commission cycle, which will be paid on Friday, October 30.  If that doesn't happen, please let me know and I will research."  (Doc. 39-3 at 2).  On October 30, 2009, Nappier informed Skaggs he had not received payment for the applications, even though he was still having to service the clients.  (*Id.*).  On November 13, 2009, Nappier notified Skaggs, via email, that he had "received a list from you of 17 app[lications] with effective [dates] of 07/01/2009 that are effective," and that he had only been paid $275 in commission—lower than he believed he was entitled.  (Doc. 31-2 at 45).

### III. Analysis

#### A.  Title VII Race Discrimination

Absent direct evidence of discrimination, a plaintiff can establish a *prima facie* case of disparate treatment by demonstrating: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside of his protected class more favorably than he was treated; and (4) he was qualified to do the job.  *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006); *see also Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981), *McDonnell Douglas Corp. v. Green*, 411 U.S.  792, 802-04 (1973).  A plaintiff's discrimination claim is not doomed simply because there are no similarly-situated employees who may be used as comparators.  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011).    "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Id.* at 1328.

There is no dispute Nappier is a member of a protected class, UnitedHealth terminated

his employment, and Nappier was qualified to do his job. The parties, however, disagree as to whether there is evidence to support the third element – that UnitedHealth treated a similarly situated non-white employee more favorably than Nappier. Specifically, Nappier argues UnitedHealth retained Smoot, a black employee, when Nappier was terminated. (Doc. 38 at 14). UnitedHealth argues Smoot is not a proper comparator because he is not "similarly situated to [Nappier] in all relevant respects," and that Nappier and Smoot worked primarily in different regions. (Doc. 30 at 23 (quoting *Holidfield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

Although both parties cite the traditional *McDonnel Douglas* framework, (doc. 30 at 20-21 & doc. 38 at 13), when a plaintiff is terminated as part of a reduction-in-force ("RIF"), the Eleventh Circuit has explained that a plaintiff can establish a *prima facie* case by showing (1) he is a member of a protected class; (2) he was terminated; (3) he was qualified for another position at the time of termination; and (4) the employer intended to discriminate in failing to consider him for another position. *Conner v. Bell Microproducts-Futre Tech, Inc.*, 492 Fed. Appx. 963, 965 (11th Cir. 2012) (citing *Rowell v. BellSouth Corp.*, 433 F.3d 794, 798 (11th Cir. 2005) (ADEA), *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995)). This modification eliminates the requirement that the plaintiff present evidence of a comparator to establish a *prima facie* case of discrimination and instead requires "the plaintiff produce some evidence that the employer did not treat him neutrally with respect to his protected-class membership, but, instead, discriminated upon it." *Conner*, 492 Fed. Appx. at 965 (citing *Rowell*, 433 F.3d at 798). This evidence must lead the fact finder to reasonably conclude either the employer consciously refused to consider retraining or relocating the plaintiff due to his protected class membership, or that the employer considered his protected-class membership as a negative factor in that consideration. *Id.* (citing *Rowell*, 433 F.3d at 798).

Case 2:13-cv-01382-JHE   Document 46   Filed 03/18/16   Page 14 of 21

Regardless of the "framework" applied, Nappier fails to present evidence of intentional discrimination to survive summary judgment. Under the traditional *McDonnell Douglass* framework, even if the court assumes Smoot is a proper comparator and thus Nappier can demonstrate a *prima facie* case, Nappier has not presented evidence of pretext. After the *prima facie* case is established, UnitedHealth would be required to offer a legitimate, nondiscriminatory reason for Nappier's termination, which UnitedHealth has done. *Lopez v. AT&T Corp.*, 457 Fed. Appx. 872, 874 (11th Cir. 2012); *see Chavez v. URS Federal Tech. Servs., Inc.*, 504 Fed. Appx. 819, 821 (11th Cir. 2013). According to Joseph, UnitedHealth decided to eliminate all ISR positions in Alabama except for the position held by John Walley (who, like Nappier, is white) and that its elimination of Smoot's position was delayed for two months because he was involved in multiple marketing initiatives that UnitedHealth wanted to see through conclusion. (Doc. 31-3 at ¶18, 20-21). UnitedHealth having asserted a non-discriminatory reason for retaining Smoot, Nappier must present evidence such that a reasonable juror could conclude that the asserted nondiscriminatory reason is pretextual, *Lopez*, 457 Fed. Appx. at 874, and Nappier has failed to do so.

A plaintiff may demonstrate pretext by directly persuading the court that a discriminatory reason more likely motivated the employer or, alternatively, "by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Product, Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 256). The plaintiff must demonstrate "such weakness, implausibilities, inconsistencies, incoherencies, or contradiction in the employer's proffered legitimate reason for its action that a reasonable fact finder could find them unworthy of credence." *McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008). "A plaintiff may not show pretext by recasting an employer's proffered nondiscriminatory reasons or by

substituting [his] business judgment for that of the employer."  *Jackson v. Agency for Persons with Disabilities Fla.*, 608 Fed. Appx. 740, 742 (11th Cir. 2015) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).  The same type of evidence used to establish pretext in traditional discrimination case is considered in a RIF case to determine whether the employer consciously refused to consider retraining or relocating the plaintiff due to his race or whether the employer considered the plaintiff's race as a negative factor in that consideration.  *Conner*, 492 Fed. Appx. at 965  (citing *Rowell*, 433 F.3d at 798).

Joseph, with recommendations from Todd Skaggs, Sales Director, selected the ISR positions in Alabama to be eliminated.  (Doc. 31-3 at ¶21).  In his declaration, Joseph explains as follows:

> We based our selection decision upon multiple factors and not just a consideration of job performance.  We primarily considered the profitability of various markets in Alabama, and Montgomery was the least profitable market.  We also considered an ISR's acquisition cost per lead, meaning the amount of money UnitedHealth had to spend on an ISR, including salary and expenses, in order to generate one lead, as well as an employee's overall expenses.  Because Mr. Nappier and Mr. Teel were telecommuters, their expenses were higher than Mr. Smoot's expenses.  We made the decision that the only ISR position in Alabama which was paying for itself and generating revenue for UnitedHealth was the position held by John Walley, and therefore decided all other ISR positions would be eliminated.  We made the decision to delay Mr. Smoot's severance from UnitedHealth for two months, as he was involved in various marketing initiatives that we wanted to see through conclusion.  We were at the time working with the American Diabetes Association as the signature sponsor of a program that they were doing in the faith-based community in the Birmingham area, thereby allowing Mr. Smoot to promote UnitedHealth's products at these events.  We were also a paid sponsor of the Binny Miles Radio show and based on the contractual obligations with that show, a UnitedHealth representative was to be in studio every Thursday to field Medicare related questions from the radio audience.  Mr. Smoot had been selected to be that individual since he was the one who brought that opportunity to UnitedHealth.  Additionally, we were in the midst of negotiating some extremely favorable radio marketing rates with yet another radio station with which Mr. Smoot had been instrumental in assisting with, creating concerns about potential business risks associated with not seeing these initiatives through to their conclusion.  These initiatives were all concluded by September 2009, and Mr. Smoot's reduction-in-force was initiated.  The

decision to delay the termination of Mr. Smoot's employment was based solely upon UnitedHealth's business needs at the time.  Following the reduction-in-force, Mr. Walley was the only ISR in Alabama, and remains the only ISR in Alabama to date.  UnitedHealth did not hire replacements for any of the ISR positions eliminated during the 2009 reduction-in-force.

(Doc. 31-3 at ¶21).

Nappier quarrels with UnitedHealth's decision to retain Smoot for an additional two months, characterizing their justification as "essentially that expenses associated with his retention were lower because [Nappier] was a telecommuter and [Smoot] was not, and that Smoot was involved in certain marketing initiatives in which [Nappier] was not." (Doc. 38 at 22).  As to the costs associated with retention, Nappier argues "[i]t stretches the bounds of logic to contemplate how maintaining office space which entails literally every single expenses associated with [Nappier], with the possible exception of mileage, but with greater overhead, would be somehow 'cheaper' than retaining [Nappier], who worked from home. . . ." (Doc. 38 at 22).  Although Joseph stated the telecommuting ISRs' expenses were higher than Smoot's expenses, this was not UnitedHealth's stated reason for retaining Smoot for two additional months.  (*See* doc. 31-3 at ¶21).  Specifically, Joseph explained he considered this, along with other factors that go into figuring out an ISR's acquisition cost per lead, and determined the only ISR position in Alabama paying for itself was the position held by John Walley, who, like Nappier, is white.  (*Id.*).  Any dispute over the cost of a telecommuting ISR versus a non-telecommuting ISR relates to UnitedHealth's conclusion that the position held by Walley was the only profitable ISR position in Alabama.[3]

---

[3] Even if there was some relevant dispute as to whether UnitedHealth's conclusion that its telecommuting ISRs had higher expenses than Smoot, when an employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment. *White v. Crystal Mover Servs., Inc.*, 615 Fed. Appx. 545, 548 (11th Cir. 2015) (citing *Chapman*, 229 F.3d at 1037).  As demonstrated *supra*, Nappier has not

In response to UnitedHealth's explanation that Joseph decided to retain Smoot for two months to complete several marketing initiatives, Nappier contends this is "puzzling" because "if Smoot's job responsibilities were really so different from [Nappier's] in the marketing regard" UnitedHealth should have attempted "to distinguish Smoot's responsibilities in this regard in an attempt to demonstrate how Smoot is an improper comparator . . . ."  (Doc. 38 at 22).  Nappier further contends "[i]f 'business needs' really dictated firing decisions, it seems it would make the most 'business' sense to retain the employee who was the top performer, perhaps assign him additional responsibilities to account for any 'marketing' needs, and terminate those individuals whose performance was found lacking."  (*Id.*).  It appears here that Nappier is not only trying to substitute his business judgment for that of UnitedHealth's, but also his purported legal expertise, attempting to dictate what United Health should have argued.   However, Joseph specifically identified three on-going marketing initiatives Smoot was involved in 2009: the partnership with the American Diabetes Association's program in the faith-based community; the in-studio commitment with the Binny Miles radio show, a program Smoot brought to UnitedHealth; and the on-going negotiations of favorable marketing rates with another radio station that Smoot had been instrumental assisting with.   (Doc. 31-3 at 11).

UnitedHealth was not required to retain Nappier to complete these marketing initiatives simply because he was the most experienced or historically the most productive ISR in Alabama.  (*See* doc. 31-2 at 33-36).  Nappier's statement that Joseph made the decision to terminate his employment instead of a worse performing black employee, (doc. 38 at 20), simply recasts and misrepresents the undisputed facts.  UnitedHealth's decision to retain Smoot for two months to complete projects with which he was already involved or that he worked to acquire does not

done so.

create a genuine issue of material fact as to pretext or to any alleged discriminatory intent.

Additionally, Nappier's testimony that Joseph favored black employees over white employees does little, if anything, to show pretext or any alleged discriminatory intent. (Doc. 38 at 20). Nappier testified "[Joseph] was a lot more friendlier to the black guys. It was just obvious to me that he like the black guys better than he did me, you know, would rather be friends with them or whatever. . . . [Joseph] was a lot - - he was a lot more sociable with them." (Doc. 31-1 at 29 (113:9-19)). Assuming these allegations about Joseph are true, they do not show that UnitedHealth's proffered reason for retaining Smoot was pretextual and are insufficient to create a "convincing mosaic" of circumstantial evidence to infer intentional discrimination. *See Chavez*, 504 Fed. Appx. at 822 (stating that evidence a manager was less friendly to the plaintiff than some of her colleagues does not amount to discrimination). Likewise, Nappier fails to present evidence that UnitedHealth did not treat him neutrally with respect to his race, but, instead, discriminated upon it. *See Conner*, 492 Fed. Appx. at 965 (citing *Rowell*, 433 F.3d at 798). UnitedHealth is due summary judgment on this claim.

## B. Breach of Contract

Nappier contends UnitedHealth owes him commission for approximately seventeen applications he wrote in July 2009, prior to his termination.[4] (*See* doc. 38 at 23-25). When Nappier asked Skaggs, via email, about his July 2009 commission, Skaggs responded as follows on October 21, 2009:

---

[4] In his complaint Nappier also alleges UnitedHealth's breach of an oral contract for employment for life and that his salary would increase from $31,500.00 to $36,000.00. (Doc. 1 at ¶¶26 & 27). Although UnitedHealth addressed these claims in its motion for summary judgment, Nappier failed to mention them at all in his opposition brief. (*See* docs. 30 & 38). Accordingly, any such claims are deemed abandoned. *See Burnett v. Harvard Drug Group, LLC*, No. CV-13-S-1620-NE, 2015 WL 3648762 at *6 (N.D. Ala. June 22, 2015) (citing *Chapman*, 229 F.3d at 1027).

> Steve - It is my understanding that your commission will be released on the normal commission cycle, which will be paid on Friday, October 30. IF for some reason that does not happen, please let me know and I will research. – Todd

(Doc. 39-3 at 2).   On October 30, 2009, Nappier sent Skaggs the following email:

> i [sic] was to be paid today for 17 apps..the 90 days is up…I called my bank..no deposit..this is money owed me..i am still having to service these clients….I WANT MY MONEY!!!!!!!  STEVE NAPPIER

(*Id.*).

Joseph testified he personally reviewed UnitedHealth's records regarding the commissions it paid Nappier, as well as the applications Nappier wrote prior to his termination. (Doc. 31-1 at ¶¶1, 30).  Based on his review of the records, and in light of UnitedHealth's policy regarding "charge backs" for rapid disenrollments (i.e., deductions from any potential commissions for customers who terminate their policies within ninety days of enrollment) Joseph calculated Nappier received all of the commissions due.  (*Id.* at ¶30).  Although his brief insinuates he did not get paid for any of the "approximately seventeen applications," Nappier testified he received $275 for these.  (Doc. 31-1 at 39 (152:13-15)).  This amount is reflected in an email Nappier sent Skaggs on November 13, 2009, that stated as follows:

> Todd
>
> i [sic] received notice from uhc that 275 dollars was deposited in my account..UNACCEPTABLE!!!...i received a list from you of 17 apps with effective of 07/01/09 that are effective..3rd grade math tells one that is not correct…thanks for your help!!!!!  Steve

(Doc. 31-2 at 45).[5]

To avoid summary judgment, Nappier must produce evidence, not merely conclusory allegations, supporting his claim he is entitled to additional commissions.  *See Green v. Mobis*

---

[5] In his complaint, however, Nappier states that "[t]o date, [UnitedHealth] has only . . . paid [Nappier] approximately $1,300.00 in commissions.  (Doc. 1 at ¶18).

*Ala., LLC*, 613 Fed. Appx. 788, 793 (11th Cir. 2015) ("The plaintiff must present evidence demonstrating that it can establish the basic elements of its claim, *Celotex*, 477 U.S. at 322, . . . since 'conclusory allegations without specific supporting facts have no probative value' at the summary judgment stage.  *Evers v. Gen. Motors Corp*., 770 F.2d 984, 986 (11th Cir.1985)."). Here, Nappier's evidence establishes he contacted Skaggs, his former supervisor, to inquire about the commission he believed he was due, that Skaggs advised him any such commission would be paid on October 30, 2009, and that he emailed Skaggs after receiving $275, believing he was entitled to more commission.  (Docs. 39-3 at 2 & 31-2 at 45).   Nothing Nappier offers disputes UnitedHealth's evidence that Joseph reviewed company records regarding the commissions it paid Nappier, and that, based on that review, Nappier received all the commission he was due.   (*See* doc. 31-3 at ¶30).   There is no evidence Nappier served interrogatories or requests for production on UnitedHealth seeking the records on which Joseph relied.   Additionally, there is no evidence Nappier attempted to depose Joseph to obtain evidence to refute UnitedHealth's position that, due to rapid disenrollment charge-backs, Nappier was not owed any further commission.   Nappier's failure to engage in this or similar discovery does not shift the ultimate burden of proof to UnitedHealth to disprove Nappier's claim.   Nappier has not offered evidence to create a genuine issue of material fact he is owed any further commission. UnitedHealth is entitled to summary judgment on this claim.

### IV. Conclusion

For the reasons stated above, UnitedHealth's motion for summary judgment, (doc. 29), is **GRANTED**, and this action will be **DISMISSED WITH PREJUDICE**.  A separate order will be entered.

DONE this 18th day of March 2016.

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE